# EXHIBIT B



**WILCOX & FETZER LTD.**

In the Matter Of:

# Collins
## v.
## Kearney, et al.

C.A. # 05-739 SLR

---

Transcript of:

Curtis M. Collins

August 17, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Collins                                v.                    Kearney, et al.
Curtis M. Collins              C.A. # 05-739 SLR             August 17, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CURTIS M. COLLINS,            )
                              )
        Plaintiff,            )
                              )  Civil Action
v.                            )  No. 05-739 SLR
                              )
WARDEN RICK KEARNEY, et al.,  )
                              )
        Defendants.           )

     Deposition of CURTIS M. COLLINS taken pursuant to notice at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, beginning at 10:15 a.m. on August 17, 2006, before Vincent J. Bailey, Registered Professional Reporter and Notary Public.

APPEARANCES:

    ERIKA Y. TROSS, ESQ.
    DEPARTMENT OF JUSTICE
      820 N. French Street, 6th Floor
      Wilmington, Delaware  19801
      For the Defendant Rick Kearney, James Chandler, and Bradley Berezansky

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 2

1            CURTIS M. COLLINS,
2      the deponent herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5            EXAMINATION
6  BY MS. TROSS:
7      Q. Mr. Collins, my name is Erika Tross. I'm the
8  attorney for the State defendants Rick Kearney, Sergeant
9  James Chandler, and Bradley Berezansky. I'm from the
10 Department of Justice. We're here in the matter of
11 Collins versus Kearney, civil lawsuit that you filed,
12 case number 05-739. You named a couple of other
13 defendants in your lawsuit, Correctional Officer
14 Milligan, Correctional Officer Daisey and Correctional
15 Officer Irvin Johnson, and two John Does, but they have
16 not been served yet, so I'm not their attorney.
17         I'm going to explain to you a little bit
18 about why we're here today. We're here for a deposition.
19 As you may be aware, a deposition is part of the
20 discovery process. I'm going to ask you a series of
21 questions and then you are going to answer them and your
22 answers will be given under oath, as you saw when he
23 swore you in. So your answers are subject to the laws of
24 perjury.

Page 3

1          You can object to any question that I ask,
2  but you still have to answer the question.
3          The court reporter will be taking down all
4  of my questions and all of your answers. Therefore, we
5  have to speak one at a time, because the court reporter
6  cannot take down a transcription if we are both talking.
7          Also, all of your answers have to be verbal.
8  The court reporter cannot take down a nod or uh-huh. So
9  you have to either say yes or no if a yes or no answer is
10 required.
11         Okay. I will assume that if you answer a
12 question that you have understood the question, so if you
13 don't understand what I'm asking, please ask me for
14 clarification.
15         Couple other things. We may take a couple
16 of hours, so you are allowed to have breaks if you would
17 like a break. If you need to take a break or you need to
18 use the bathroom, let me or the officer know.
19         I will give you time at the end to add
20 anything you think I should know about the case that we
21 didn't cover.
22         And, finally, I need to know: Are you
23 taking any medication or drugs which cloud your judgment
24 or prevent you from understanding questions and giving

Page 4

1  true answers?
2      A. Yeah, I'm on medication.
3      Q. What medication?
4      A. I'm taking Sinequan.
5      Q. Can you spell that?
6      A. I don't know how to spell it.
7      Q. What is it for?
8      A. For depression and all that.
9      Q. Do you think that would cloud your judgment or
10 prevent you from giving honest answers?
11     A. I don't know. I don't think so.
12     Q. Okay.
13     A. If anything it might be I might forget some
14 things, you know what I mean --
15     Q. All right.
16     A. -- that would transpire in the case, you know.
17     Q. If that happens we will try to uncover your
18 memory.
19         So let's begin. Can you please give me your
20 full name?
21     A. Curtis M. Collins.
22     Q. What's the M stand for?
23     A. Marcel.
24     Q. Have you used any other names or aliases?

Page 5

1      A. No. I got a nickname, Boo.
2      Q. Did you bring anything with you to this
3  deposition?
4      A. Yes. I got a little bit of paper.
5      Q. Some of your legal paperwork relating to this
6  case?
7      A. Yes.
8      Q. Did you review anything in preparation for the
9  deposition? Did you read anything?
10     A. No.
11     Q. Okay. Did you look at anything before the
12 deposition?
13     A. No.
14     Q. Did anyone show you anything or tell you
15 anything?
16     A. No.
17     Q. Okay. Have you ever been deposed before?
18     A. No.
19     Q. Okay. Have you ever testified in court before?
20     A. No.
21     Q. Have you ever filed a civil lawsuit besides this
22 one?
23     A. No.
24     Q. What is your date of birth?

2 (Pages 2 to 5)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 6

1  A.  12-27-63
2  Q.  Where were you born?
3  A.  Providence, Rhode Island.
4  Q.  Where did you grow up?
5  A.  Connecticut and Providence and back and forth.
6  Q.  Okay. Prior to your incarceration where did you
7  live?
8  A.  In Wilmington.
9  Q.  Okay. How long were you a resident in
10 Wilmington?
11 A.  About four, five months.
12 Q.  With whom did you live there?
13 A.  Excuse me?
14 Q.  With whom did you live while you were in
15 Wilmington?
16 A.  Relative.
17 Q.  Was it an aunt or uncle?
18 A.  A cousin.
19 Q.  Okay. What is your highest level of education?
20 A.  I went to 10th.
21 Q.  Where did you go to 10th grade, what school?
22 A.  Central High School in Rhode Island.
23 Q.  What was the last full-time job you held prior to
24 your incarceration?

Page 7

1  A.  No. I didn't have no job.
2  Q.  Okay. Are you currently married?
3  A.  No.
4  Q.  Do you have any children?
5  A.  Yes.
6  Q.  What are your children's names?
7  A.  Curtis Lavallee Collins.
8  Q.  Is that your only child?
9  A.  Yeah. That I know of, yeah.
10 Q.  Okay. Where are you currently being housed?
11 A.  Medium security transition pod.
12 Q.  How long have you been there?
13 A.  I've been there about approximately two months
14 now.
15 Q.  What other housing locations have you been at
16 since August of 2005?
17 A.  The SHU.
18 Q.  The SHU here at Delaware Correctional Center?
19 A.  Yes.
20 Q.  Were you at any other institution other than DCC?
21 A.  SCI.
22 Q.  Okay.
23 A.  Georgetown prison.
24 Q.  Now we are going to transition a little, I'm

Page 8

1  going to ask you some questions about the case. Do you
2  understand the difference between what someone personally
3  does and what their employees do?
4  A.  Somewhat, yeah.
5  Q.  Can you explain to me a little bit about the
6  difference?
7  A.  The difference between?
8  Q.  What someone personally does and what their
9  employees do.
10 A.  I don't know how to explain that.
11 Q.  Okay. Well, are you aware that in an institution
12 like a prison correctional officers must have the ability
13 to take action and make decisions without necessarily
14 consulting the warden? Do you understand that sometimes
15 the officer would have to make a decision without talking
16 to the warden first?
17 A.  No. I don't understand that.
18 Q.  So you believe that a correctional officer should
19 always consult the warden before he makes a decision?
20 A.  I don't know. I can't answer that.
21 Q.  Okay. Do you know what decisions the warden is
22 involved in?
23 A.  No.
24 Q.  You named Rick Kearney as a defendant in the

Page 9

1  lawsuit, so I'm now going to ask you a series of
2  questions intended to clarify what he as an individual
3  person has done or refused to do that has caused you to
4  name him in the lawsuit. When I ask questions about
5  Warden Kearney I'm not asking about what his employees
6  might have done. I'm asking what he specifically has
7  done. Do you understand that? So I'm asking what he
8  personally did.
9  A.  Okay. What he did, he ignored a lot of my
10 requests that I had wrote him about, concerning about the
11 officers' brutality, beating me up.
12 Q.  Okay.
13 A.  I had wrote him three or four times, explained to
14 him and telling him what was going on. And every time I
15 wrote him I never got a response from him.
16 Q.  Who specifically is Rick Kearney? Who do you
17 understand him to be?
18 A.  I believe he's the deputy warden.
19 Q.  Of what prison?
20 A.  SCI.
21 Q.  Okay. Can you give me a physical description of
22 him? Do you know his height?
23 A.  No. I have never seen him before.
24 Q.  Okay. What is Mr. Kearney's job?

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Collins v. Kearney, et al.
Curtis M. Collins   C.A. # 05-739 SLR   August 17, 2006

Page 10

1   A. His job is to oversee the institution, I believe.
2   Q. What are his job responsibilities?
3   A. What are his job responsibilities? To make sure
4   everything is going all right throughout the prison.
5   Q. Okay. How do you know that that's his
6   responsibility? Have you read that anywhere?
7   A. No. I'm just, I'm assuming that he's the deputy
8   warden of the institution, so, you know, he's the man
9   that be calling the shots.
10  Q. But you have never seen like any official
11  document or manual that says what he does?
12  A. No.
13  Q. Have you ever had a conversation with Warden
14  Kearney?
15  A. No.
16  Q. Okay. Why did you name him as a defendant in the
17  lawsuit?
18  A. Like I said before, he was -- the reason why I
19  named him is because he had rejected a lot of my letters
20  that I had wrote to him about, concerning about the
21  officers.
22  Q. Okay. Did Warden Kearney ever personally use
23  force on you on August 6, 2005?
24  A. No. Not him, but his officers did.

Page 11

1   Q. Okay. Has he ever personally used physical force
2   on you on any occasion?
3   A. No.
4   Q. Did he ever personally strike you or punch you?
5   A. No.
6   Q. Has he ever pushed you or shoved you? And did he
7   ever cap stun you?
8   A. No, but his officers did.
9   Q. So you agree that Warden Kearney never personally
10  used physical force on you?
11  A. Right.
12  Q. Okay. What actions did Warden Kearney personally
13  take to violate your rights?
14  A. What actions did he take to violate my rights?
15  Q. What did he do to violate your rights?
16  A. Like I say, he wasn't cooperative every time I
17  wrote him a letter.
18  Q. Okay. So you are saying he never wrote you back,
19  never responded?
20  A. I named him as a defendant because every time I
21  wrote him a letter, I never got a response from him.
22  Q. Okay. Did you prepare the initial complaint in
23  this matter, in this lawsuit? The civil complaint, did
24  you prepare that?

Page 12

1   A. Yeah.
2   Q. When you drafted the initial complaint, did you
3   check it to make sure that it was correct?
4   A. No. I just went right through it.
5   Q. Okay. Is every allegation in it true?
6   A. Yes.
7   Q. All right. I'm now going to have the court
8   reporter mark for me, mark this as Defendant's Exhibit
9   Number 1. This is the initial complaint that you filed
10  in the lawsuit.
11      (Defendant's Deposition Exhibit No. 1 marked
12  for identification.)
13  BY MS. TROSS:
14  Q. Will you agree that this is a copy of your
15  initial complaint that you filed? And feel free to
16  review it and go through it.
17  A. (Witness complies.)
18      Yes. That's it.
19  Q. Can you turn to the third page of the document,
20  please?
21  A. (Witness complies.)
22  Q. Under the section marked "Statement of Claim,"
23  can you read to me number 1 where you start off with
24  "warden"? Can you read that out loud?

Page 13

1   A. "This person knows how correctional staff treat
2   inmates and fully aware of how officers are known to beat
3   inmates without cause."
4   Q. Okay. Now, when you say that the warden is fully
5   aware of how officers are known to beat inmates without
6   cause, what information or evidence do you have to
7   support that claim?
8   A. Other inmates and his officers also know that
9   these guys are racist.
10  Q. So you are going by what other inmates and
11  officers have told you?
12  A. Right. And this guy here, he's been going around
13  assaulting people for years and years, this same
14  Berezansky guy and the rest of the officers that were
15  with him.
16  Q. So when you say this guy has been assaulting
17  people, you are referring to Officer Berezansky and not
18  the warden?
19  A. Right.
20  Q. Okay. Do you have any documentation that
21  supports your claim that the warden knows how the
22  officers are beating inmates?
23  A. No.
24  Q. Okay. Do you have any information or evidence

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 14

1  that supports your claim that Warden Kearney was aware of
2  the incident that occurred on August 6th, 2005? Do you
3  have any documents?
4  A. No.
5  Q. Okay. Would you agree that Warden Kearney was
6  never personally present at any time when you were in the
7  chow hall during breakfast on August 6, 2005?
8  A. Am I aware he wasn't present?
9  Q. Yes.
10 A. Right.
11 Q. He wasn't present?
12 A. Right.
13 Q. Okay. Do you agree that Warden Kearney was never
14 personally present at any time that you claim you were
15 injured during breakfast on August 6, 2005?
16 A. No. I'm not aware of that.
17 Q. Do you believe he was present when you were
18 injured?
19 A. Yes. I believe he was present at the time.
20 Q. You saw him?
21 A. No. I didn't see him, but I'm thinking that he
22 should have been there, you know what I mean? Monday
23 through Fridays, that's -- he works Mondays through
24 Fridays.

Page 15

1  Q. Was he in the chow hall?
2  A. No. He wasn't.
3  Q. But you believe that he was at the prison?
4  A. Somewhere, yes.
5  Q. Okay. Do you have any information or documents
6  that support your claim that Warden Kearney personally
7  directed any action against you?
8  A. No.
9  Q. Do you have anything to support that?
10 A. No.
11 Q. Is there anything else you would like to tell me
12 regarding what you believe Warden Kearney personally did
13 and is personally responsible for what happened on August
14 6, 2005? Is there anything else you would like to tell
15 me in relation to Warden Kearney?
16 A. No. I just thought that he was responsible
17 because he's the warden of the prison, he oversees his
18 officers. So like I say, every time I wrote him a
19 letter, I never got a response.
20 Q. Okay. All right. Now let's move a little bit to
21 the incident. Who is Bradley Berezansky?
22 A. That's the officer.
23 Q. Why did you name him as a defendant in the
24 lawsuit?

Page 16

1  A. Because he's the one who assaulted me.
2  Q. Okay. Who is James Chandler?
3  A. That's the sergeant, Sergeant James Chandler.
4  Q. Why did you name him as a defendant?
5  A. Because he was present when it happened.
6  Q. Okay. Did he assault you?
7  A. No. But he was -- he could have stopped it, what
8  was happening. He could have stopped the whole thing.
9  Q. Okay. Your complaint is based on an incident
10 that allegedly occurred on August 6, 2005 at breakfast in
11 the chow hall at SCI. Can you please tell me in your own
12 words exactly what occurred on that day?
13 A. 8-6-05 I was going to chow hall at SCI. The
14 tables was all full. I asked a couple inmates to slide
15 down and CO Berezansky yelled out, calling me, "shut the
16 F up and dump your food tray." And at that point I was
17 trying to explain to him that I was asking the inmates to
18 slide down and he still said, "shut the F up and throw
19 your food tray away."
20     So I obeyed his order. I got up and threw
21 my food tray away and I walked to the side. When I
22 walked to the side I spoke to the sergeant about what,
23 the situation and CO Berezansky was very upset when I
24 went to the sergeant.

Page 17

1  Q. The sergeant what sergeant are you referring to?
2  A. Sergeant Chandler.
3     CO Berezansky was very upset when I went to
4  him to talk to him what was going on for breakfast. And
5  when I was speaking to the sergeant, I told him what was
6  transpiring. So -- the sergeant refused to acknowledge
7  me, so I walked out of the chow hall. When I was walking
8  out the chow hall, CO Berezansky said something real
9  smart to me and I turned around to see what he said, you
10 know. He came charging at me. He came charging at me
11 and he assaulted me, punched me in my face.
12    And then after that his officers got
13 involved and they all pushed me inside the chow hall,
14 slammed me up against the wall. After that they threw me
15 to the floor and handcuffed me and sprayed me all up and
16 started punching, kicking on me.
17 Q. Okay. Did anything happen after that?
18 A. After that they took me to a holding cell. And
19 stayed in the holding cell for 10, 15 minutes, they came
20 in there pushing me around and I asked them could I see
21 the nurse, I need a nurse because I had such pains in my
22 ribs.
23    When the nurse came, she refused -- she just
24 looked at me and said there's nothing wrong with you and

5 (Pages 14 to 17)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 18

1  that was that.
2  Q. Okay. That's everything that happened that day?
3  A. That was everything that happened that day.
4  Q. Okay. Can you tell me the names of all the
5  correctional officers who were present in the chow hall?
6  A. I believe it was CO Irvin Johnson, it was
7  CO Milligan, CO Daisey, Sergeant Chandler, CO Berezansky.
8  Q. Okay. Now let's go through your version of the
9  incident from the beginning. You say that you entered
10  the chow hall at breakfast time, correct?
11  A. Yes.
12  Q. Immediately after you entered the chow hall what
13  did you do? What was the first thing you did as soon as
14  you got in the chow hall?
15  A. First thing I did was grab my tray and went to go
16  sit down.
17  Q. After you obtained your tray you went to look for
18  a seat?
19  A. Right.
20  Q. Okay. Were there any open seats that you saw
21  after you obtained your tray?
22  A. I don't know. But his job, the officers' job was
23  to make sure that there's 8 people to a table. That was
24  his job.

Page 19

1  Q. So you didn't see any open seats after you got
2  your tray?
3  A. No, because if I did see any open seats, I can't
4  take that seat because you have to fill one table up
5  first.
6  Q. The table that you went to go sit down, were
7  there already 8 people there?
8  A. That right there, I think so -- no. I think
9  there was only like 7 and I asked somebody to slide down
10  and when I asked someone to slide down, they --
11  Q. Was there another table that was available?
12  A. I don't know.
13  Q. Okay. You said that after obtaining your tray,
14  you asked someone to move so that you could sit down. Do
15  you recall the name of the inmate who you asked to slide
16  down?
17  A. Let me see. I don't know their names at this
18  point. I don't know their names.
19  Q. Do you know if you knew their names at the time?
20  At the time you asked them you did know their name?
21  A. I think so, yeah.
22  Q. So is there anything that I could show you that
23  would help you remember their names? Is there any sort
24  of document or anything that would help you remember the

Page 20

1  names of the inmates you asked to slide down?
2  A. No.
3  Q. Okay. Do you agree when you asked the inmate to
4  slide down that you were talking in the chow hall during
5  breakfast?
6  A. Was I talking in the chow hall?
7  Q. Yes.
8  A. No. I wasn't talking in the chow hall.
9  Q. But you did ask the inmate to slide down?
10  A. Right.
11  Q. Do you agree that you are not supposed to talk in
12  the chow hall during breakfast? That's a rule?
13  A. Well, they say that's a rule, but if the officer
14  was doing his job, then I wouldn't have to say that. The
15  officer wasn't doing his job.
16  Q. Is it possible that you could have asked the
17  officer where you could sit?
18  A. No. It is not possible, because the officer, he
19  stands over everybody. He already know how many people
20  supposed to be at a table. And every other time he would
21  tell inmates to slide over or move over, sit your butt up
22  on the dot, all this other stuff. They already know all
23  of that. As soon as you come in the chow hall that was
24  his job, to tell the other inmates to slide down. That's

Page 21

1  not my job.
2  Q. Okay. You said that after you asked the inmate
3  to slide down so you could sit, Officer Berezansky told
4  you to shut the F up or throw your food tray away?
5  A. That's correct. Throw your food tray away,
6  right.
7  Q. What did you do after he told you to shut the F
8  up?
9  A. I obeyed his order.
10  Q. So what did you do?
11  A. I threw my food tray away.
12  Q. Okay. You never said anything to him?
13  A. No. I went to the sergeant.
14  Q. Okay. You said you did dump your tray, correct?
15  A. Right.
16  Q. You said that after you dumped your tray you
17  spoke with Sergeant James Chandler, correct?
18  A. That's correct.
19  Q. Would you agree that speaking to Sergeant
20  Chandler is talking?
21  A. No. No. I don't agree to that.
22  Q. Okay. But you were speaking with him?
23  A. I was talking to Sergeant Chandler.
24  Q. Okay. What happened after you dumped your tray

6 (Pages 18 to 21)