# EXHIBIT B (cont')

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 22

1  and finished talking with Sergeant Chandler, what
2  happened next?
3  A. I was walking out the chow hall. As I was
4  walking out the chow hall, CO Berezansky said something
5  smart and I turned around and he come charging at me.
6  Q. Did you say anything to CO Berezansky when you
7  turned around?
8  A. I think I asked him what was he talking about. I
9  think I said something to him like what was you -- I
10  thought he was giving me another direct order.
11  Q. Okay. After you dumped your tray, did you at any
12  time turn toward officer Berezansky and lunge toward him?
13  A. No.
14  Q. Did you ever jump toward him?
15  A. No.
16  Q. Did you walk toward him?
17  A. No.
18  Q. Did you even step in his direction?
19  A. No. I stepped in the middle of the floor.
20  Q. Okay. After you dumped your tray did you turn
21  towards officer Berezansky with your hands in a fist?
22  A. No.
23  Q. Were your hands clenched?
24  A. No.

Page 23

1  Q. Were they raised?
2  A. No.
3  Q. After you dumped your tray did you turn towards
4  officer Berezansky with your teeth clenched?
5  A. No.
6  Q. Did you in any way after you dumped your tray
7  turn and threaten officer Berezansky?
8  A. No.
9  Q. Did you in any way lead officer Berezansky to
10  believe that you were coming toward him?
11  A. No.
12  Q. Okay. I am now going to hand the court reporter
13  what he's going to mark as Defendant's Exhibit Number 2.
14  And then he's going to hand that to you. Defendant's 2
15  is the incident report filed by Officer Berezansky.
16        (Defendant's Deposition Exhibit No. 2 marked
17  for identification.)
18  BY MS. TROSS:
19  Q. Can you take a moment to read and review the
20  incident report?
21  A. (Witness complies.)
22  Q. Are you finished?
23  A. My write-up is different than that.
24  Q. Let's go through it, okay. In the first line can

Page 24

1  you read for me the incident date at the very top, the
2  date that's listed in the report? You see what I'm
3  referring to? It's the top line, it is shaded and it is
4  the third column over.
5  A. Incident date 8-6-05.
6  Q. Then could you read for me the location
7  description? If you go four lines down on the left it
8  says "location description"? Top box?
9  A. Okay.
10  Q. Location description, do you see where it says,
11  "MSB chow hall"?
12  A. I need glasses.
13  Q. All right. In location description it says, "MSB
14  chow hall." And then under "individuals involved," as
15  the inmate it lists "Curtis Collins." So would you agree
16  that this is the incident report that officer Berezansky
17  filed in relation to the incident on August 6, 2005?
18  A. No.
19  Q. You don't believe this is the incident report he
20  filed?
21  A. Like I said, I got a report in here that he wrote
22  up. It is different.
23  Q. Okay.
24  A. This is not it.

Page 25

1  Q. Would you please send me a copy of that report in
2  the mail?
3  A. The copy of his report.
4  Q. A copy of the report.
5  A. I believe I have it.
6  Q. Could you send me a copy of it after the
7  deposition?
8  A. Okay. I'll do that.
9  Q. Let's go through this incident report. In his
10  incident report officer Berezansky says that you walked
11  toward him with your fist and teeth clenched. What did
12  you do that would make officer Berezansky believe that
13  you were walking toward him with your fists and teeth
14  clenched?
15  A. I don't -- I don't see nothing, because this guy
16  here, this guy is 6'5, 350 pounds. Why would I want to
17  walk towards him?
18  Q. Are you saying that officer Berezansky is lying
19  when he says that you walked toward him with your fist
20  and teeth clenched?
21  A. Yeah, at some point, because I didn't have my
22  fist balled up or nothing like I was going to assault him
23  or anything like that.
24  Q. Okay. I now have another document, the court

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 26

1  reporter is going to mark this as Defendant's Exhibit
2  Number 3. Exhibit Number 3 is the incident report filed
3  by Officer Jeffrey Daisey, and after he has marked it he
4  is going to show it to you.
5      (Defendant's Deposition Exhibit No. 3 marked
6  for identification.)
7  BY MS. TROSS:
8  Q. Take a moment to review.
9  A. Who wrote this report up here?
10 Q. Officer Daisey.
11 A. Okay.
12 Q. Are you finished?
13 A. Yes.
14 Q. Have you ever seen this document before?
15 A. Never.
16 Q. Okay. The incident date in this report is also
17 listed as August 6, 2005. And the location description
18 is listed as the chow hall.
19     Officer Daisey says in his incident report
20 that as you were exiting the chow hall you turned around
21 in a threatening manner and raised your fist in a
22 fighting stance and was lunging toward CO Berezansky.
23 What did you do that would make Officer Daisey say you
24 turned around in a threatening manner and raised your

Page 27

1  fist in a fighting stance?
2  A. Can you say that again?
3  Q. Sure. What, if anything, did you do that would
4  make Officer Daisey say that you turned around in a
5  threatening manner and raised your fists in a fighting
6  stance?
7  A. I didn't do anything.
8  Q. Okay. So would you say that Officer Daisey is
9  lying when he said that?
10 A. Yes.
11 Q. I am now going to give the court reporter what
12 he's going to mark at Defendant's Exhibit Number 4. And
13 Exhibit Number 4 is the incident report of Officer Shawn
14 Emerick.
15     (Defendant's Deposition Exhibit No. 4 marked
16 for identification.)
17 BY MS. TROSS:
18 Q. You can take a moment to review that as well.
19 A. (Witness complies.)
20 Q. Are you finished?
21 A. Yes.
22 Q. The incident date in this report is also listed
23 as August 6, the location as the MSB chow hall. Officer
24 Emerick says in his report that you walked towards

Page 28

1  CO Berezansky in a threatening manner with your fist
2  clenched. Inmate Collins then lunged at CO Berezansky as
3  he was exiting the chow hall.
4      What, if anything, did you do that would
5  make Officer Emerick say that you lunged at CO
6  Berezansky?
7  A. I didn't do anything.
8  Q. So are you saying that Officer Emerick is lying?
9  A. That's a lie.
10 Q. Is he also lying when he says that you had a
11 threatening manner with your fists clenched?
12 A. Yes.
13 Q. Okay. I am now going to hand the reporter
14 Exhibit Number 5. Exhibit Number 5 is the disciplinary
15 hearing decision.
16     (Defendant's Deposition Exhibit No. 5 marked
17 for identification.)
18 BY MS. TROSS:
19 Q. You can take a moment to review that.
20 A. (Witness complies.)
21 Q. Do you see where it says -- have you ever seen
22 this document before?
23 A. I don't know. I'm not sure.
24 Q. Okay. Do you see where it says "inmate

Page 29

1  statement"?
2  A. Yes.
3  Q. Could you read that aloud for me, please?
4  A. Talking about the testimony part?
5  Q. No. Right above that, after it says, "inmate
6  plea," it says, "not guilty." And then right under --
7  A. He cursed at me and stated for me to dump -- he
8  stated for me to dump my tray and shut my F'ing mouth. I
9  complied and dumped my tray. On my way out I asked him
10 why are you talking to me like that? He stated again to
11 shut the F up as I was leaving the chow hall. I turned
12 and told him he should shut his F'ing mouth. That's when
13 he ran towards me and sprayed me and then took me to the
14 floor and started kicking me.
15 Q. Is this the statement that you gave at the
16 disciplinary hearing?
17 A. I think so. I'm not sure.
18 Q. Well, according to this statement you say that
19 "as I was leaving the chow hall I turned and told him he
20 should shut his F'ing mouth." Why did you turn around?
21 A. I turned around, because he had said something to
22 me at the chow hall. I thought he was giving me another
23 direct order. As far as me cursing at him, I don't
24 recall that.

Collins                                    v.                              Kearney, et al.
Curtis M. Collins              C.A. # 05-739 SLR                          August 17, 2006

Page 30

1  Q. Okay. But you did turn around and say something
2  to him?
3  A. No. I turned around. I didn't say anything to
4  him.
5  Q. You don't recall if you told him to shut his
6  F'ing mouth?
7  A. Right. I don't recall that.
8  Q. Okay. So let's return to the rest of your
9  description of the events of that day. What happened
10 after you dumped your tray?
11 A. After I dumped my tray, I went to Sergeant
12 Chandler to speak with him about his officers.
13 Q. Okay. And after you spoke with Sergeant Chandler
14 what happened?
15 A. He refused to acknowledge me and I walked away
16 from him.
17 Q. Okay.
18 A. As I was walking, CO Berezansky said something
19 smart to me. I turned around to see what he said in case
20 he was giving me another direct order and he just charged
21 at me.
22 Q. As he was charging at you, what did you do to
23 defend yourself?
24 A. I didn't no nothing. I just stood still and he

Page 31

1  assaulted me.
2  Q. Did you put your hands up to protect your head
3  and face?
4  A. No, because I didn't think he was going to swing
5  on me. I thought he was just going to talk to me. But
6  that didn't work out like that. He assaulted me.
7  Q. I would think if someone was charging toward you,
8  you would at least put your hands up, try to protect
9  yourself. Did you do anything?
10 A. I didn't do none of that. I thought he was going
11 to talk to me. I thought he was going to talk to me. I
12 didn't think he was going to assault me. If I thought he
13 was going to assault me, then I would have put my hands
14 up.
15 Q. Okay. After he charged towards you, what
16 happened next?
17 A. After he charged towards me, he punched me in the
18 face.
19 Q. Then what happened?
20 A. Then all the other officers got involved.
21 Q. What other officers was that?
22 A. CO Berezansky, CO Daisey, CO Irvin Johnson, and
23 CO Milligan.
24 Q. They all got involved?

Page 32

1  A. They all got involved. All the officers there
2  got involved.
3  Q. What did they do?
4  A. They pushed me, slammed me up against the wall
5  and had me in handcuff position. They slammed me down to
6  the floor. Then they -- when they slammed me down to the
7  floor, they cuffed me. Started kicking me and spraying
8  me and punching me as I was in handcuffs.
9  Q. Okay. You say they cap stunned you, correct?
10 You said they sprayed you?
11 A. Right, with a couple cans, two cans of pepper
12 spray while I was in handcuffs.
13 Q. Were you doing anything at that time?
14 A. No.
15 Q. Were you trying to protect yourself?
16 A. I couldn't because from the spray.
17 Q. After they sprayed you and handcuffed you, what
18 occurred next?
19 A. They took me to ASDA holding cell.
20 Q. Is that the ASDA holding?
21 A. Right. They took me to ASDA holding cell. They
22 were supposed to take me straight to the nurse, but they
23 never did. They took me to a holding cell.
24 Q. Okay. After they took -- at any point did you

Page 33

1  see a nurse?
2  A. Yeah, about 20 minutes later after I was
3  complaining.
4  Q. Do you remember the name of the nurse?
5  A. No, I don't.
6  Q. Did you know the name of the nurse at the time?
7  A. No.
8  Q. Does the name Helen Whitley sound familiar?
9  A. Like I say, I don't know her name.
10 Q. Okay.
11 A. But that's her name, then that's her name.
12 Q. What, if anything, did you say to the nurse?
13 A. I just told her that I had pains in my ribs. And
14 she said there's nothing wrong with me, you know what I
15 mean? That was that.
16 Q. Okay.
17 A. She said there was nothing wrong and they shut
18 the door on me.
19 Q. I'm going to now have the court reporter mark
20 another document as Defendant's Exhibit Number 6.
21 Exhibit Number 6 is the incident report filed by Helen
22 Whitley.
23        (Defendant's Deposition Exhibit No. 6 marked
24 for identification.)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 34

1    THE WITNESS: That's the nurse?
2    BY MS. TROSS:
3    Q. That's the name of the medical provider listed in
4    the incident report.
5    A. Okay. That's the Thursday, then.
6    Q. You can take a moment to review that.
7    A. (Witness complies.)
8    Q. Are you finished?
9    A. Yes.
10   Q. Okay. As can you see, the incident date listed
11   in the report is 8-6, 2005. Under location description
12   it says holding cell. And under individuals involved it
13   says inmate Curtis Collins and staff Helen Whitley, okay.
14       Do you see where it says "description of
15   incident" up in the top box?
16   A. Yeah.
17   Q. Can you read that for me, what it says?
18   A. It says I am assessed after cap stun, no
19   injuries.
20   Q. Okay. Then do you see where it says "immediate
21   action taken" in the second box?
22   A. Yeah.
23   Q. Can you read that for me, please?
24   A. It says, I'm assessed.

Page 35

1    Q. You are saying I am assessed?
2    A. Okay. I am assessed, no noted injuries or noted
3    bruising.
4    Q. Thank you.
5        So Helen Whitley says that when she examined
6    you, there were no noted injuries and no noted bruising.
7    Would you agree with what she said?
8    A. No. That's a lie.
9    Q. Okay. What happened after the nurse left?
10   A. After the nurse left, they -- after the nurse
11   left, they took me out of the holding room. They put me
12   in ASDA 1.
13   Q. ASDA 1?
14   A. Right.
15   Q. How long were you in ASDA 1?
16   A. 47 days, something like that. About 47 days.
17   Q. Mr. Collins, why do you believe that you were
18   disciplined and placed in ASDA 1?
19   A. Can you say that again?
20   Q. Why do you believe that you were disciplined and
21   placed in ASDA 1?
22   A. Why I was disciplined?
23   Q. Why do you believe that you were placed in ASDA
24   1?

Page 36

1    A. I was placed in ASDA 1 because I guess that's
2    their rules when someone gets written up or something
3    like that. Everybody got to go to ASDA.
4    Q. Okay. Were you later given an opportunity to eat
5    your breakfast?
6    A. No.
7    Q. Did any other inmates see what happened in the
8    chow hall that day?
9    A. Yes.
10   Q. Can you name some of the inmates?
11   A. I know their names, but I want to save that for
12   trial. I don't want them to be assaulted by correctional
13   officers down at SCI --
14   Q. Okay.
15   A. -- because they are real racist.
16   Q. Did you ever talk with any other inmates about
17   what happened that day?
18   A. No. Not really, no.
19   Q. Okay. Let's go back for a moment to Exhibit
20   Number 1, which is the first document I gave you. That
21   was your complaint. You should still have it there. Can
22   you go back to that with me?
23   A. Um-hm.
24   Q. Okay. Let's go to page number 5 of the document.

Page 37

1    I think it is two pages away from that one. Right there.
2    Okay.
3        Would you agree that this is the statement
4    of facts that you wrote for your civil complaint?
5    A. Yes.
6    Q. Okay. On page 1 of the statement can you count
7    about 9 lines down where it starts with "now the"? Do
8    you see that?
9    A. Milligan you said?
10   Q. No. Where you start the sentence that says, "now
11   the plaintiff." If not, I'll read it to you if you can't
12   find it. Are you able to find out?
13   A. You can read it.
14   Q. You say in your statement, "now the plaintiff
15   understands and knows that there is no talking in the
16   chow hall."
17   A. Okay.
18   Q. So you were aware that you were not supposed to
19   be talking in the chow hall?
20   A. Right.
21   Q. Okay. Now turn with me to the second page of
22   your statement. Next page, at the very top it starts
23   with "therefore." You said, "therefore, officer wrongly
24   accused the plaintiff of talking."

10 (Pages 34 to 37)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 38

1    A.  Right.
2    Q.  Why do you say you were wrongly accused of
3    talking?
4    A.  Because I asked a couple inmates to slide down.
5    Q.  Is that talking?
6    A.  I'm saying it is talking, but it is not like --
7    to me it is not talking, because all I'm doing is asking
8    someone to slide down. Their job is to make sure there's
9    8 people to a table. They are supposed to make sure
10   there's supposed to be space. That's their job. I got
11   to ask someone to slide down, what am I going to do? Sit
12   down on the floor? I got to eat my breakfast that I'm
13   entitled to.
14   Q.  Now I'm going to read the next few sentences.
15   You said after we finished the sentence about talking,
16   you say, "officer approaches the plaintiff in a very
17   unprofessional manner and made plaintiff throw his food
18   tray away. So plaintiff obeyed the direct order to throw
19   his tray away. Then plaintiff approaches Sergeant James
20   Chandler in a respectful manner and asked why the
21   plaintiff couldn't finish his meal."
22        When you were told to dump your tray, it was
23   because of talking, correct? It was because the officer
24   believed you were talking?

Page 39

1    A.  Yes. I think that's correct,.
2    Q.  So, then, why did you need to ask Sergeant
3    Chandler why you had to dump your tray?
4    A.  I asked Sergeant Chandler why I had to dump my
5    tray, because I want to get fed. That's my breakfast.
6    They are not going to feed me? They are supposed to feed
7    me. That's the law. So I went to a higher command.
8    Q.  Okay. I'm now going to read the next sentence.
9    You say, "So Sergeant Chandler did not respond to
10   plaintiff because he did not want to go against his
11   officers. As plaintiff was speaking to the sergeant, CO
12   Berezansky became very perturbed because plaintiff was
13   talking to the sergeant about what was transpiring."
14   A.  Right.
15   Q.  "So as plaintiff was leaving the chow hall,
16   officer Berezansky said something smart to plaintiff. As
17   plaintiff turned around in the chow hall to face CO
18   Berezansky to hear what he had to say" -- why did you
19   need to hear what he had to say?
20   A.  Because he's a correctional officer and I thought
21   he was giving me another direct order.
22   Q.  What were you going to do when you turned around?
23   A.  I wasn't going to do nothing. Just listen to
24   what he had to say.

Page 40

1    Q.  What were you going to do when you learned what
2    he had to say?
3    A.  I was going to walk away.
4    Q.  Okay. Mr. Collins, why is Sergeant Chandler a
5    defendant in the lawsuit?
6    A.  Because he was there. He seen the whole thing.
7    He seen everything that happened.
8    Q.  Did he ever personally strike you at that time?
9    A.  That right there, I don't know, because when they
10   were spraying me, I couldn't see for a while. I couldn't
11   see, so I don't know if he was pushing or kicking me.
12   Q.  But in your complaint you only named him because
13   you believe he could have prevented it?
14   A.  Right.
15   Q.  Okay. Is there anything else you would like to
16   tell me about what happened in the chow hall on August 6,
17   2005?
18   A.  No. Basically that's it.
19   Q.  Okay. Mr. Collins, have you ever been diagnosed
20   or told that you have anger issues?
21   A.  No.
22   Q.  Have you ever been told that you need to develop
23   coping techniques for managing anger and frustration?
24   A.  Not that I know of.

Page 41

1    Q.  Do you believe that you have difficulty
2    controlling your anger?
3    A.  Do I believe I have difficulty controlling my
4    anger?
5    Q.  Yes.
6    A.  No.
7    Q.  Do you believe that you need to develop coping
8    techniques for managing anger and frustration?
9    A.  No.
10   Q.  As we discussed earlier, you said you are taking
11   some psychotropic medications. Can you name that again,
12   please?
13   A.  Sinequan.
14   Q.  You said that's for what?
15   A.  Depression, hearing voices and stuff.
16   Q.  How long have you been on that medication?
17   A.  Ever since I got jumped by the COs.
18   Q.  Were you on the medication before then?
19   A.  No.
20   Q.  So since August 2005?
21   A.  Yes.
22   Q.  Okay. I am going to have the court reporter mark
23   for me Defendant's Exhibit Number 7. Exhibit Number 7 is
24   one of the grievance reports that you filed regarding

11 (Pages 38 to 41)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 42

1  this incident.
2  (Defendant's Deposition Exhibit No. 7 marked
3  for identification.)
4  BY MS. TROSS:
5  Q. You may take a moment to review that.
6  A. (Witness complies.)
7  Q. Are you finished?
8  A. Yes.
9  Q. Have you ever seen this document before?
10 A. I mean, not this one, but I seen something like
11 this before, yeah.
12 Q. This is related to the grievance you filed?
13 A. Right.
14 Q. For the August 6th incident?
15 A. Right.
16 Q. Okay. What is the -- do you see the date,
17 grievance date? That's listed as 8-6, 2005. Do you see
18 that?
19 A. Yes.
20 Q. You filed this grievance the same day that the
21 incident occurred?
22 A. Yes. I believe so, yes.
23 Q. Can you read for me where it says "remedy
24 requested"?

Page 43

1  A. Remedy requested.
2  Q. You see the second box? Can you read, next to
3  "remedy requested," can you read what it says?
4  A. I would like for all the officers involved to be
5  reprimanded.
6  Q. Yes. Keep going.
7  A. As well as Sergeant Chandler because he watched
8  it go down, right.
9  Q. Okay. So is it correct that on the date that
10 this incident occurred, you requested that the officers
11 be reprimanded?
12 A. Yes, at that time because I didn't know what I
13 was doing, because I was still messed up. I didn't
14 really know what I was really doing at that time.
15 Q. Okay. What was the outcome of this grievance?
16 A. I believe it was denied.
17 Q. Did you appeal?
18 A. Yes.
19 Q. Okay. What was the outcome of the appeal?
20 A. Never got a response.
21 Q. Who did you appeal to?
22 A. The board.
23 Q. Okay. I'm going to have the court reporter mark
24 this next exhibit as Defendant's Exhibit Number 8. This

Page 44

1  is another grievance that you filed regarding this
2  incident.
3  (Defendant's Deposition Exhibit No. 8 marked
4  for identification.)
5  BY MS. TROSS:
6  Q. You can take a moment to review that as well.
7  A. (Witness complies.)
8  Q. You are finished?
9  A. Yes.
10 Q. The grievance date on this report is listed as
11 August 6, 2005. Do you recognize this document?
12 A. Yes.
13 Q. Is this also a grievance that you filed?
14 A. Yes. I think so, yeah. I think this is it.
15 Q. It was filed on the date that the incident
16 occurred, August 6, 2005?
17 A. I think so, yes.
18 Q. Under "remedy requested" you see the second box?
19 A. Yes.
20 Q. Can you read what it says next to "remedy
21 requested"?
22 A. "All officers involved, as well as Sergeant
23 Chandler who watched it be reprimanded."
24 Q. So on August 6, 2005 you were again asking that

Page 45

1  the officers be reprimanded for what occurred, correct?
2  A. Yes. I didn't know what I was doing at that
3  time.
4  Q. What do you mean you didn't know what you were
5  doing?
6  A. As far as them being reprimanded.
7  Q. Okay. Is there something different you would
8  have asked for on that day?
9  A. Well, yeah.
10 Q. What would you have asked for?
11 A. I would have asked for them to be fired.
12 Q. Okay. What was the outcome of this grievance?
13 A. Denied.
14 Q. Did you appeal?
15 A. Yes. I believe I appealed that, too, yes.
16 Q. What was the outcome of the appeal?
17 A. No answer.
18 Q. Who did you appeal to?
19 A. Grievance board.
20 Q. Okay. I'm going to have the court reporter mark
21 this document as Exhibit Number 9. Exhibit Number 9 is
22 another grievance report that was filed.
23 (Defendant's Deposition Exhibit No. 9 marked
24 for identification.)

12 (Pages 42 to 45)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 46

1  BY MS. TROSS:
2  Q. Take a moment to review it, please.
3  A. (Witness complies.)
4     Okay.
5  Q. The date of this grievance report is listed as
6  September 30th, 2005, 9-30, 2005. Do you recognize this
7  document?
8  A. Yeah.
9  Q. Is this a grievance that you filed regarding the
10 August 6 incident?
11 A. I believe so.
12 Q. Okay. Under "remedy requested" in the second box
13 can you read out loud what it says next to "remedy
14 requested"?
15 A. It says, "$500,000 for pain and suffering and
16 some form of disciplinary action against those involved."
17 Q. Is it correct that it wasn't until about a month
18 and a half later that you requested money for pain and
19 suffering?
20 A. I believe so. I think so.
21 Q. Why did your requested remedy change between the
22 time of the first two grievances and this last grievance?
23 A. Why did I change?
24 Q. Yes.

Page 47

1  A. I didn't know, like I said, I didn't know what I
2  was doing at that time.
3  Q. What was the outcome of this grievance?
4  A. Same thing, denied.
5  Q. Did you appeal?
6  A. Yes. I believe I appealed that, too.
7  Q. Who did you appeal it to?
8  A. Same people, grievance board.
9  Q. What was the outcome of the appeal?
10 A. Like I said, I never got a response.
11 Q. Okay. Did you file any other grievances
12 regarding the incident that occurred on August 6, 2005?
13 A. I'm not sure. I probably did, probably put a
14 couple more in there.
15 Q. Do you have copies of those grievances?
16 A. I think so, but I don't have them with me.
17 Q. Could you please send me a copy?
18 A. If I have more I'll send them to you.
19 Q. Thank you.
20    Let's talk a little bit about the injuries
21 that you contend you received as a result of the incident
22 on August 6, 2005. Could you please tell me what
23 injuries you received from that incident?
24 A. Broken ribs -- broken ribs, busted lip, sprained

Page 48

1  wrist, eye trouble from pepper sprays. I believe that's
2  it.
3  Q. That's everything?
4  A. I believe that's everything.
5  Q. We are going to discuss each one, one by one.
6  When did you first fill out a sick call slip for your
7  broken ribs?
8  A. I believe it was the same day or the next day --
9  I believe it was the same night or next day.
10 Q. "Same night" meaning what day?
11 A. I believe it was on 8-6-05.
12 Q. Do you have copies of those sick call slips?
13 A. I think I do.
14 Q. If so, could you please send me copies?
15 A. If I have them.
16 Q. When was the first time you saw a nurse for your
17 broken ribs?
18 A. That same day.
19 Q. When you say "same day" --
20 A. Nurse Helen.
21 Q. -- August 6, 2005?
22 A. Right, August 6, 2005.
23 Q. What was the first time you saw a doctor for the
24 broken ribs?

Page 49

1  A. First time I saw a doctor was -- man, I don't
2  know. I can't recall. Maybe 40-something days.
3  Q. Did you know at the time when the first time was
4  that you saw a doctor?
5  A. No. I don't remember when, but I know I seen one
6  afterwards, maybe about a couple months later.
7  Q. So it was months later that you first saw a
8  doctor for your ribs?
9  A. I think so. All I seen was nurses, two nurses,
10 and I saw Dr. Burns. That's what I seen. Dr. Burns is
11 the last person I saw and she's the one that had my x-ray
12 reports.
13 Q. When was the first time you saw Dr. Burns?
14 A. I got the date written down somewhere in my cell.
15 It was, I think it was about 47 days, 48 days later.
16 Q. What treatment did you receive for the broken
17 ribs?
18 A. They gave me some type of medicine for broken
19 ribs. They gave me, I believe it was Motrin or something
20 like that. Motrin and some other kind of pain pill I
21 believe. I don't remember.
22 Q. Did you have any type of physical therapy?
23 A. No. They ain't gave me none of that, no.
24 Q. Did they put like a bandage or something around

13 (Pages 46 to 49)