# EXHIBIT B (cont' 1)

Page 50

1 your ribs?
2 A. No. I used a t-shirt.
3 Q. You said "they" --
4 A. They had it on order. Before I was getting ready
5 to leave, they order me one of them to go around my
6 waist.
7 Q. Did you ever receive it?
8 A. No, because I came here.
9 Q. What medication were you prescribed for the
10 broken ribs?
11 A. They were giving me Motrin I believe.
12 Q. When did your ribs start to get better, heal?
13 When did that occur?
14 A. My ribs started getting better probably about --
15 as I say, it still hurts once in a while. It still hurts
16 just a little. Not too much.
17 Q. But they have healed?
18 A. I believe so. I'm not sure.
19 Q. Are you currently receiving treatment for your
20 broken ribs?
21 A. No.
22 Q. When was the last time you filled out a sick call
23 slip for the broken ribs?
24 A. I believe that was about a month and a half ago,

Page 51

1 maybe two months ago, something like that.
2 Q. You filled out a sick call slip while you were
3 here at DCC?
4 A. Right, for my ribs.
5 Q. Do you have copies of those sick call slips?
6 A. I might. If I do I'll send them to you.
7 Q. Okay. Thank you.
8   When was the last time you saw a doctor or
9 nurse for your broken ribs?
10 A. That was in here. That happened in here, I seen
11 a nurse in here about my ribs, because I was still having
12 a little bit more pain. I needed some Motrin. I don't
13 recall what date. Like I say, if I have that copy, I'll
14 send it to you.
15 Q. Are you currently taking any medication?
16 A. Yes.
17 Q. What medication?
18 A. Sinequan.
19 Q. Are you currently taking medication for your
20 broken ribs?
21 A. No.
22 Q. When was the last time you took medication for
23 your broken ribs?
24 A. Probably about 2 months ago.

Page 52

1 Q. Was that the Motrin?
2 A. Yes.
3 Q. When did you first fill out a sick call slip for
4 your busted lip?
5 A. I believe that was the same day my ribs got
6 broken.
7 Q. August 6?
8 A. I believe August 6, something like that.
9 Q. Do you have copies of the sick call slips for
10 your busted lip?
11 A. I have copies, I believe. If I have copies I'll
12 send them to you.
13 Q. When was the first time you saw a nurse for your
14 lip injury?
15 A. My lip injury?
16 Q. Yes.
17 A. I never seen a nurse for my lip injury. I seen a
18 nurse for my ribs. I was supposed to see a nurse for my
19 ribs.
20 Q. Did you ever see a doctor for your busted lip?
21 A. No.
22 Q. So were you given treatment or medication for
23 your busted lip?
24 A. No.

Page 53

1 Q. Okay. When did your lip start to heal?
2 A. My lip injury?
3 Q. Yes. When did it start to heal?
4 A. I'll say two days, a day or two.
5 Q. Okay. When did you fill out a sick call slip for
6 your sprained wrist?
7 A. I believe I filled that out on the same day I got
8 injured.
9 Q. What day was that?
10 A. 8-6-05 I believe.
11 Q. Could you please mail me a copy of any sick call
12 slips?
13 A. I'll mail you all of them if I got them.
14 Q. Thank you.
15   When was the first time you saw a nurse for
16 your sprained wrist?
17 A. I don't remember. I think the same time, same
18 time I put in my first one for my ribs, 8-6-05. I
19 believe that I put that all in together.
20 Q. Did you ever see a doctor for your sprained
21 wrist?
22 A. No.
23 Q. Did you ever receive any treatment or medication
24 for your sprained wrist?

14 (Pages 50 to 53)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

### Page 54

1  A. No.
2  Q. When did your wrist start to get better?
3  A. Couple weeks.
4  Q. Do you have any pain in your wrist today?
5  A. No.
6  Q. When was the last time you had any pain in your
7  wrist?
8  A. I can't recall that.
9  Q. Okay. Last injury you said was you had eye
10 trouble from the pepper spray. When did you first fill
11 out a sick call slip for your eye trouble?
12 A. I believe it was the same day, 8-6-05 I believe.
13 Q. When was the first time you saw a nurse for your
14 eye trouble?
15 A. I never seen one.
16 Q. Did you ever see a doctor?
17 A. Yeah, I did. I seen -- no. I never seen a
18 doctor.
19 Q. You never saw a doctor for your eye trouble?
20 A. No. But I seen the eye doctor up here.
21 Q. For your eye problems?
22 A. Right.
23 Q. So you didn't see an eye doctor until you came to
24 DCC?

### Page 55

1  A. Right.
2  Q. Were you prescribed any medication?
3  A. No.
4  Q. Was any treatment given for your eye trouble?
5  A. Yeah.
6  Q. What kind of treatment?
7  A. They gave me some glasses.
8  Q. Okay. Did you need glasses before August 6,
9  2005?
10 A. No.
11 Q. Have you ever had glasses before?
12 A. No.
13 Q. Okay. Has your eye trouble gotten better?
14 A. A little bit.
15 Q. Do you have any pain in your eyes today?
16 A. It jumps a lot sometimes.
17 Q. What do you mean?
18 A. The nerves or something in my eyes jump a lot.
19 Q. Have you ever been sprayed with pepper spray
20 before?
21 A. Let me see. Not that I know of.
22 Q. Have you ever been sprayed since August 6, 2005?
23 A. No.
24 Q. When was the last time you saw a doctor for your

### Page 56

1  eye trouble?
2  A. I believe the same time I went for my ribs.
3  Q. Do you still have your glasses?
4  A. Yes.
5  Q. Where are they?
6  A. I got them, but I got to get new ones.
7  Q. Okay. Mr. Collins, do you work out?
8  A. Yeah. I do a little bit of therapy.
9  Q. Do you lift weights?
10 A. Sometimes.
11 Q. Did you lift weights prior to August 6, 2005?
12 A. Was I lifting weights?
13 Q. Yes.
14 A. No.
15 Q. You weren't lifting weights prior to August 6,
16 2005?
17 A. No.
18 Q. But you have lifted weights since then?
19 A. No.
20 Q. Okay. So when you say you work out, what type of
21 exercise do you do?
22 A. I might do a little bit of -- I might try to run
23 a little bit or something like that.
24 Q. Have you ever injured yourself from running?

### Page 57

1  A. No.
2  Q. According to your initial complaint, you say that
3  you have experienced pain and suffering. Can you please
4  explain the pain and suffering you have experienced?
5  A. It was excruciating pain all over my ribs. On
6  one side of my body it was like real bad.
7  Q. Any other pain?
8  A. Not that I know of.
9  Q. How long did the pain last?
10 A. Pain lasted for at least, I'll say at least 8
11 months, 9 months, something like that.
12 Q. You also say suffering. What type of suffering
13 did you experience?
14 A. Suffering was that they didn't really treat me
15 for my ribs.
16 Q. Okay. I am going to have the court reporter mark
17 our next document as Defendant's Exhibit Number 10.
18 Exhibit Number 10 is the amended complaint that you filed
19 in the lawsuit.
20        (Defendant's Deposition Exhibit No. 10
21 marked for identification.)
22        THE WITNESS: That's the one that was
23 dismissed.
24 BY MS. TROSS:

Collins v. Kearney, et al.
Curtis M. Collins   C.A. # 05-739 SLR   August 17, 2006

Page 58

1  Q. Part of it?
2  A. That's the one.
3  Q. Take a moment to review it again.
4  A. (Witness complies.)
5  Q. Can you please turn to page 7, section entitled
6  "Demand for Relief." Okay. Under the section marked
7  "Demand for Relief," can you please read out loud number
8  2?
9  A. "Monetary compensation in the amount of $500,000
10 for the injuries inflicted on him by the four
11 defendants."
12 Q. So according to your amended complaint, you are
13 requesting monetary damages in the amount of $500,000,
14 correct?
15 A. Right.
16 Q. How did you arrive at that number?
17 A. Like I say, I really didn't know what I was doing
18 at that time. I would leave that up to the jury to
19 determine that.
20 Q. So would you change this number?
21 A. Would I change the number? Yeah, I would.
22 Q. What would you change it to?
23 A. I would just leave it up to the jury.
24 Q. Okay. Why did you initially put $500,000? What

Page 59

1  made you choose that number?
2  A. Like I say, I really didn't know what I was doing
3  at that time.
4  Q. Okay. Can you please read number 3 under the
5  section "Demand for Relief"?
6  A. "Unconditional release from the custody and
7  control of Delaware Department of Corrections to
8  society."
9  Q. So you are requesting release from the custody
10 and control of the Delaware Department of Correction to
11 society?
12 A. Yes.
13 Q. What is your short term release date?
14 A. It's so far back, I don't even know. I'm so far
15 back I don't even know.
16 Q. Do you know your maximum release date?
17 A. I don't even know that, Mrs. Tross.
18 Q. Why do you believe that you should be released
19 from the custody of DOC if you win your lawsuit?
20 A. Why do I believe that?
21 Q. Yes.
22 A. I believe that because I've been assaulted by all
23 these defendants and, you know, I believe that should be
24 one of my reliefs. If they offer me anything, I would

Page 60

1  like to be set free.
2  Q. Can you read number 4 under the demand for
3  relief?
4  A. "Order from the court to all defendants to stay
5  away from and have no contact with Plaintiff Collins
6  while he is in custody and control of Delaware Department
7  of Corrections."
8  Q. So you are asking for an order from the court to
9  all defendants to stay away from and have no contact with
10 you while you are in the custody and control of the
11 Department of Corrections?
12 A. Yes.
13 Q. Do you currently have contact with any of the
14 defendants in the lawsuit?
15 A. No.
16 Q. Okay. We're finished with that document.
17    Our last document I'm going to have the
18 court reporter mark as Exhibit Number 11. Exhibit Number
19 11 is the defendants' combined first set of
20 interrogatories and request for production of documents
21 directed to plaintiff.
22    (Defendant's Deposition Exhibit No. 11
23 marked for identification.)
24 BY MS. TROSS:

Page 61

1  Q. Take a moment to review that, please.
2  A. (Witness complies.)
3     Okay.
4  Q. This document was mailed to you on May 31, 2006
5  and again on July 10, 2006. Have you ever seen this
6  document before?
7  A. Yes.
8  Q. Okay. Do you understand that in accordance with
9  the federal rules you are required to respond to the
10 questions in this document within 30 days after the date
11 they were mailed to you?
12 A. Yes.
13 Q. Is there any reason why you chose not to respond?
14 A. The reason why I didn't respond to that is
15 because at that time I really didn't have no stamps and
16 stuff like that. I didn't have no one to help me out
17 with it.
18 Q. What kind of help did you need?
19 A. I needed some help as far as my writing and
20 stuff. And, you know, I can't really write all that
21 good.
22 Q. You wrote your complaint?
23 A. Somebody helped me with it, though.
24 Q. They would help you?

16 (Pages 58 to 61)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 62

1  A. With the writing, yeah.
2  Q. When you say someone helped you with the
3  complaint, how did they help you?
4  A. By writing it for me.
5  Q. Did you tell them what to write or they just
6  wrote --
7  A. Some parts I told them what to write, yes.
8  Q. At other parts they wrote what they wanted to
9  write?
10 A. Yeah -- what I want them to write, they put it
11 down.
12 Q. Were there any parts that they wrote on their
13 own?
14 A. Not that I know of.
15 Q. Did they also help you write the amended
16 complaint?
17 A. Yes.
18 Q. Were there any parts of the amended complaint
19 that they wrote on their own?
20 A. No. That was all mine.
21 Q. So you told them what to write and they wrote it
22 down?
23 A. Yes.
24 Q. Okay. We are going to go through a few of the

Page 63

1  questions that were in those interrogatories.
2        Have you ever spoken with or written to
3  anyone regarding the incident that occurred on August 6
4  2005?
5  A. Concerning about this case?
6  Q. Yes.
7  A. My family.
8  Q. Okay. Anyone else besides your family?
9  A. I wrote to the governor, Ruth Ann Minner.
10 Q. When did you write the governor?
11 A. I believe it was on -- it was like 8-9 -- I have
12 the date. I have it in here.
13 Q. So you can send me a copy of that?
14 A. Yeah. In fact, as a matter of fact I answered
15 this whole thing here. I got it in here, though.
16 Q. Can you send me a copy of that?
17 A. Yes.
18 Q. Who else did you write besides your family and
19 the governor?
20 A. I wrote to the ACLU. I wrote to the Department
21 of Justice. I wrote to the -- who else did I write to?
22 I wrote to -- that's it.
23 Q. Did the governor respond?
24 A. No. No -- excuse me. I wrote to the Department

Page 64

1  of Corrections, Internal Affairs.
2  Q. Okay. Did the governor respond to your letter?
3  A. Yes.
4  Q. What did she say?
5  A. She said that she would get in touch with Stan
6  Taylor or somebody concerning this matter.
7  Q. Did you hear any further from the governor?
8  A. I never heard from Stan Taylor.
9  Q. Did you hear any more from the governor?
10 A. No.
11 Q. Did the ACLU respond?
12 A. Yes. I think they did respond, yes.
13 Q. Do you recall what they said?
14 A. They were just telling me to send them some more
15 paperwork on this.
16 Q. Did you?
17 A. No.
18 Q. Okay. Did the Department of Justice respond?
19 A. Yes, but they couldn't help me.
20 Q. Did Internal Affairs respond to your letter?
21 A. No.
22 Q. Have you ever spoken with or written to officer
23 Berezansky regarding the incident that occurred?
24 A. No.

Page 65

1  Q. Have you ever spoken with or written to Sergeant
2  Chandler regarding the incident that occurred?
3  A. No.
4  Q. Have you ever spoken with or written to Warden
5  Kearney regarding the incident that occurred on August 6?
6  A. No.
7  Q. You never sent any letters to Warden Kearney?
8  A. Yes, I did. I did, right.
9  Q. How many letters did you send Warden Kearney?
10 A. Probably about 5 or 6 of them.
11 Q. Do you recall the dates of those letters?
12 A. I think I have them. I think I have them written
13 down somewhere.
14 Q. Could you send me copies of the letters, please?
15 A. I will send you a copy of it and the dates.
16 Q. Thank you.
17       Did Warden Kearney ever respond?
18 A. No.
19 Q. Did anyone from his staff ever respond?
20 A. No.
21 Q. Mr. Collins, do you have any documents in your
22 possession or control that relate or discuss what
23 occurred on August 6, 2005 in addition to the grievances
24 that we have already discussed?

17 (Pages 62 to 65)

Collins v. Kearney, et al.
Curtis M. Collins   C.A. # 05-739 SLR   August 17, 2006

Page 66

1   A. Yeah. I have all the letters and stuff that I
2   received -- yes, I have them.
3   Q. Can you send me copies of everything you have?
4   A. I'll send them to you.
5   Q. Do you have any documents in your possession or
6   control that relate or discuss the injuries that you
7   claim you received on August 6, 2005?
8   A. No. I don't think so. If I do, if I have
9   something, I'll send it.
10  Q. Thank you.
11      Prior to August 6, 2005 have you ever
12  suffered any injuries to your ribs?
13  A. Prior to 2005?
14  Q. Yes.
15  A. Have I ever suffered any injuries?
16  Q. Yes.
17  A. Since the broken ribs?
18  Q. Before the broken ribs, did you ever break your
19  ribs before?
20  A. No.
21  Q. Did you ever fracture your ribs before?
22  A. No.
23  Q. Have you ever had any other incidents while
24  incarcerated either at SCI or DCC in which you were

Page 67

1   accused or found guilty of failing to obey an order?
2   A. Not that I know, but I've been written up a
3   couple times.
4   Q. What were you written up for?
5   A. For disobeying a direct order or disorderly
6   and --
7   Q. Was that in addition to the August 6th incident?
8   You were written up another time?
9   A. Yeah. I was written up before, right.
10  Q. What happened? When you say you were written up
11  for disobeying an order, do you remember what occurred?
12  Do you remember the reason why you were written up?
13  A. I think it was because of syrup.
14  Q. What's a syrup?
15  A. Like for your pancakes or something.
16  Q. Why were you written up?
17  A. Because they said I wasn't supposed to pass or
18  something. I wasn't supposed to give another inmate
19  syrup or something.
20  Q. You were written up for disobeying an order?
21  A. Something like that.
22  Q. Have you ever had any other incidents while
23  incarcerated where you were accused or found guilty of
24  talking in the chow hall?

Page 68

1   A. No. Not that I know of.
2   Q. Have you ever had any other incidents while
3   incarcerated where you were accused or found guilty of
4   disorderly behavior?
5   A. I believe I had one, but I forget what it was,
6   though. I believe it was the incident about the syrup.
7   Q. Were there any other incidents?
8   A. No.
9   Q. Did you keep any sort of journal or diary or
10  notebook where you discussed or described the incident
11  that occurred on August 6?
12  A. No.
13  Q. Did you keep any journal or diary or notebook
14  where you described or detailed the injuries that you
15  received on August 6?
16  A. Yeah. I got something like that, diary.
17  Q. You have like a diary?
18  A. Yeah.
19  Q. Could you send me a copy of your diary for your
20  injuries?
21  A. I think I have a diary.
22  Q. We are going to discuss a little bit about your
23  criminal history. For what crime are you presently
24  incarcerated?

Page 69

1   A. Robberies.
2   Q. When did your present incarceration begin? What
3   year?
4   A. I believe it was in, I think it was in 2000 or
5   2001.
6   Q. What sentence did you receive for robbery?
7   A. Might as well say a life sentence I believe.
8   Q. Was it life or was it in years?
9   A. It was in years. It is so many years I can't
10  even count them.
11  Q. How were those criminal charges resolved? Did
12  you plead guilty or was there a trial?
13  A. Trial.
14  Q. Approximately how much of your adult life have
15  you spent incarcerated?
16  A. I can't -- I don't even remember. So many.
17  Q. Has it been most of your life, most of your adult
18  life?
19  A. I think so. It's been a long time. I don't
20  know.
21  Q. Have you ever been arrested and convicted of
22  robbery on any other occasion?
23  A. I think so.
24  Q. Do you recall when you were convicted?

18 (Pages 66 to 69)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

Collins v. Kearney, et al.
Curtis M. Collins    C.A. # 05-739 SLR    August 17, 2006

Page 70

1   A. No.
2   Q. Do you recall the facts surrounding the case?
3   A. No.
4   Q. Were you incarcerated for that other robbery
5   conviction?
6   A. Yes. I believe I was.
7   Q. Do you recall how long?
8   A. No.
9   Q. Was there a time when you were arrested and
10  convicted of murder?
11  A. Yes. I believe, yeah.
12  Q. Do you recall when you were arrested?
13  A. No.
14  Q. Do you recall when you were convicted?
15  A. No.
16  Q. Can you tell me the facts surrounding that case?
17  A. I don't remember everything.
18  Q. Do you remember anything about what occurred?
19  A. Yeah. I know I had been assaulted. That's the
20  only thing I remember.
21  Q. So you were defending yourself?
22  A. Yes.
23  Q. Were you incarcerated for that murder?
24  A. Yes.

Page 71

1   Q. Do you recall how long?
2   A. I believe it was like maybe about 5 or 6 years,
3   something like that.
4   Q. Was there a time when you were arrested and
5   convicted of criminally negligent homicide?
6   A. Yes.
7   Q. When were you arrested?
8   A. I don't remember.
9   Q. Do you remember when you were convicted?
10  A. No.
11  Q. Can you tell me the facts surrounding that case?
12  A. No.
13  Q. Do you not remember?
14  A. I don't remember.
15  Q. You don't remember. Were you incarcerated for
16  that crime?
17  A. Yes.
18  Q. Do you remember how long?
19  A. I think I did like 6 years -- 5 or 6.
20  Q. Is this different from the murder case? Are they
21  two different crimes?
22  A. No. That is the same thing.
23  Q. Okay. Have you ever been found guilty of any
24  disciplinary violations while you were incarcerated that

Page 72

1   in any way involved dishonesty?
2   A. Not that I know of.
3   Q. Were you ever involved in smuggling contraband
4   into SCI
5   A. No.
6   Q. Were you ever involved in smuggling contraband
7   into DCC?
8   A. No.
9   Q. Have you ever approached any correctional
10  employee in an effort to convince them to help you
11  smuggle contraband into SCI?
12  A. No.
13  Q. Have you ever approached any correctional
14  employee in an effort to convince them to help you
15  smuggle contraband into DCC?
16  A. No.
17  Q. Okay. We're almost done.
18      Do you intend to call any witnesses if this
19  case goes to trial?
20  A. Yes.
21  Q. Can you name them for me, please?
22  A. No. I'd rather -- I want to leave that blank
23  until trial starts.
24  Q. Well, do you understand --

Page 73

1   A. I want to do that because I don't want them down
2   there tampering with my witnesses, because the officers
3   will do that. They will go right down there and tamper
4   with my witnesses and promise them things and then they
5   won't want to come to court.
6   Q. Okay. Do you understand that in accordance with
7   the federal rules there will come a time where you will
8   have to name your witnesses?
9   A. Yes.
10  Q. Okay. Can you give me an idea of what your
11  witnesses will testify to?
12  A. They will testify that they saw Berezansky
13  assault me in the chow hall.
14  Q. Will they testify to anything else?
15  A. They will testify that they saw them kicking me
16  and spraying me and beating me up and everything while I
17  was in handcuffs.
18  Q. Anything else?
19  A. One other thing I don't want to leave out. When
20  they took me to the ASDA that day, I have another witness
21  that was there. He heard me telling the nurse about my
22  wrist, about my ribs and stuff.
23  Q. Where was this other witness?
24  A. He was right next to me.

19 (Pages 70 to 73)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 74

1  Q. So he was also in ASDA?
2  A. He was also -- he was the only one in there with
3  me. He heard me telling the nurse that -- he heard me
4  telling the nurse that I was complaining to her about my
5  ribs and that I need something for my ribs and stuff.
6  Q. How do you know this? Did you talk to this
7  person?
8  A. Yes. He was right there. He was the only person
9  there.
10 Q. Okay.
11 A. He heard the whole thing that morning. He heard
12 when she was using profanity towards me, when I was
13 trying to talk to her.
14 Q. Will your witnesses testify to anything else?
15 A. I believe he will, yeah. He will testify.
16 Q. Anything in addition to what --
17 A. No. Just that part, because he didn't see the
18 incident, but he was just there when he heard me telling
19 the nurse and the correctional officers that I need to
20 see someone for my ribs.
21 Q. Okay. Do you intend to call any expert witnesses
22 if this case goes to trial?
23 A. Can you repeat that?
24 Q. Do you intend to call any expert witnesses at

Page 75

1  trial?
2  A. My witnesses, yeah.
3  Q. Expert witnesses, like doctors or scientists
4  or --
5  A. Not at this time, no. Not at this time.
6  Q. Okay. At this time would you like to change your
7  answer to any question that was asked?
8  A. Not really.
9  Q. Okay. So that concludes my questioning. At this
10 time you are permitted to make a statement in response to
11 the case. You may not ask me any factual or legal
12 questions, because I'm not a party to the case. Is there
13 anything else that I should know to understand what
14 happened on August 6, 2005? Is there anything else you
15 want to say?
16 A. No. That's about it. One other thing that I
17 wanted to -- all these persons that's been named in my
18 case, right, there's only two of them, like Berezansky
19 and Sergeant Chandler. So they are saying the other
20 five, the other people are not involved right now, right?
21 Q. What's happened is you have added them as
22 defendants, but you also have to serve them. Because
23 they haven't been served, I don't represent them. They
24 are not truly a part of the case until you serve them.

Page 76

1  A. Because I thought that you had represented them.
2  Q. I don't represent them until they have been
3  served and until they ask for representation.
4  A. Okay.
5  Q. Is there anything else you would like to tell me
6  about the case or your injuries?
7  A. Not that I know of. When I do I'll write it down
8  to you and send it to you in the mail.
9  Q. Okay. The court reporter is going to prepare a
10 transcript of this deposition. A transcript is a typed
11 document that contains everything that was said on the
12 record during this deposition. The transcript can be
13 used for preparing a motion for summary judgment or for
14 use at trial should we have one in this case. The
15 transcript is available for purchase. Because you are
16 proceeding in forma pauperis, I will send you a copy of
17 the transcript after the defendants receive a copy. You
18 have the opportunity to review the transcript for errors.
19 You do not, however, have to review the transcript if you
20 do not want to.
21    Do you wish to obtain a copy of the
22 transcript and review it for errors?
23 A. Yes.
24 Q. Okay. I intend to file a motion for summary

Page 77

1  judgment within the coming weeks in this matter. A
2  motion for summary judgment submits this matter to the
3  judge for a decision on whether you can present genuine
4  and material issues of fact that will require a trial.
5  The standard for summary judgment is not the same as the
6  standard for a motion to dismiss and will likely require
7  you to demonstrate factual support for your allegations.
8     Once I file my motion you are permitted to
9  file an answering brief. If you file an answering brief,
10 I then have the ability to file a reply brief. This will
11 then conclude the briefing process for summary judgment.
12    Do you have any procedural questions that
13 you would like to ask me? But please understand that I
14 can't give you legal advice. Do you have any procedural
15 questions?
16 A. No.
17    MS. TROSS: So that concludes the deposition
18 of Curtis Collins.
19    (The deposition concluded at 11:50 a.m.)

20 (Pages 74 to 77)

| Collins | v. | Kearney, et al. |
|---|---|---|
| Curtis M. Collins | C.A. # 05-739 SLR | August 17, 2006 |

Page 78

```
 1              I N D E X
 2
    DEPONENT: CURTIS M. COLLINS        PAGE
 3
 4  Examination by Ms. Tross            2
 5
 6            E X H I B I T S
 7
 8  DEFENDANT'S DEPOSITION EXHIBITS    MARKED
 9
10   1  Curtis Collins' Complaint       12
11   2  Berezansky Incident Report      23
12   3  Daisey Incident Report          26
13   4  Emerick Incident Report         27
14   5  Disciplinary Hearing Decision   28
15   6  Whitley Incident Report         33
16   7  Grievance #16024                42
17   8  Grievance #17479                44
18   9  Grievance #18132                45
19  10  Plaintiff's Motion to Amend Complaint  57
20  11  Defendants' Interrogatories     60
21
22
23
24
```

Page 79

```
 1  State of Delaware)
                     )
 2  New Castle County)
 3
           CERTIFICATE OF REPORTER
 4
        I, Vincent J. Bailey, Registered Professional
 5  Reporter and Notary Public, do hereby certify that there
    came before me on August 17, 2006, the deponent herein,
 6  CURTIS M. COLLINS, who was duly sworn by me and
    thereafter examined by counsel for the respective
 7  parties; that the questions asked of said deponent and
    the answers given were taken down by me in Stenotype
 8  notes and thereafter transcribed by use of computer-aided
    transcription and computer printer under my direction.
 9
        I further certify that the foregoing is a true
10  and correct transcript of the testimony given at said
    examination of said witness.
11
        I further certify that reading and signing of the
12  deposition were waived by the deponent and counsel.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17      Vincent J. Bailey, RPR
18      Certification No. 171-RPR
19      (Expires January 31, 2008)
20
21  DATED: 9-7-06
22
23
24
```

21 (Pages 78 to 79)